UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
NANCY GAINES,                                      :

                Plaintiff,              :

          -against-                       : **REPORT AND RECOMMENDATION**

MICHAEL ASTRUE, COMMISSIONER OF        :     08 Civ.  9812 (JSR)(KNF)
SOCIAL SECURITY,
                                   :
                Defendant.
------------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE JED S. RAKOFF, UNITED STATES DISTRICT JUDGE

## BACKGROUND

       Nancy Gaines ("Gaines") commenced this action against the Commissioner of Social

Security ("Commissioner"), seeking review of an administrative law judge's ("ALJ") decision

finding her ineligible for disability insurance benefits ("DIB"), pursuant to Title II of the Social

Security Act ("SSA"), 42 U.S.C. §§ 401-434.  The Commissioner filed an answer to the

complaint.  Thereafter, the parties made motions for judgment on the pleadings, pursuant to Rule

12(c) of the Federal Rules of Civil Procedure.

***Administrative Procedural History***

       On August 26, 2006, Gaines filed a DIB application, alleging she has been disabled since

August 19, 2005.  (Tr. 27, 37).  Her application was denied and she requested a hearing before

an ALJ.  (Tr. 32).  The hearing was held on November 7, 2007.  (Tr. 230-43).  On March 10,

2008, the ALJ found that Gaines was not disabled.  (Tr. 10-21).  On September 24, 2008, the

Appeals Council denied Gaines's request for review of the ALJ's decision, making the ALJ's

decision the final decision of the Commissioner.  (Tr. 4-6).  This action followed.

***Non-Medical Evidence***

Gaines was forty-five years old and lived with her son on the date of the ALJ's decision. (Tr. 27, 236).  She obtained a General Educational Development diploma.  (Tr. 237).  Gaines worked as a New York City Police Department traffic agent, from October 1989 to August 2005, issuing tickets and supervising others.   (Tr. 54).  Gaines's job required her to walk or stand for the entire work day.  (Tr. 54).  Gaines ceased working on August 19, 2005, after a car ran over her right foot while she was working.  (Tr. 53, 235).  Gaines alleged disability due to her foot injury, sarcoidosis,[1] seizures, headaches, asthma and high blood pressure.  (Tr. 53).  She testified that she is not able to return to work because it requires walking and she was scared that she would have seizures while working.  (Tr. 233).  She stated that she had seizures recently: (i) two weeks prior to the November 7, 2007 hearing, at her mother's house; (ii) in May 2007, while waiting for her sister on the street; and (iii) at her home, while sitting.  (Tr. 233-34).  Gaines explained that she had seizures despite the medication she was taking. (Tr. 234-35).  She testified that she could not do any sedentary work because she could not concentrate sitting down and the right side of her head, including her right eye, is affected by sarcoidosis.  (Tr. 236).  She explained that sarcoidosis caused sharp pain in the right side of her head and she had headaches two or three times a week.  (Tr. 238).  When she had headaches, Gaines would lie down and take Tylenol or Advil.  (Tr. 238).  Gaines also stated that after the seizures, she would need to take a nap for two or three hours because the medication would make her drowsy and

---

[1] "A chronic, multisystem, autoimmune disorder that can affect many body systems, but most commonly involves the lungs or lymph nodes."  American Medical Association Complete Medical Encyclopedia 1090 (Jerrold B. Leikin and Martin S. Lipsky, eds. 2003).

dizzy.  (Tr. 239).  According to Gaines, prior to her foot injury, the frequent headaches resulting

from her seizures caused her to work only two days a week.  (Tr. 238).  Gaines testified that she

could not travel alone and her sister and son helped her travel and do the household chores.  (Tr.

239).  She stated she had seizures often.  (Tr. 240).  Gaines explained that sarcoidosis caused

sores on her body and shortness of breath and she suffered from asthma.  (Tr. 240-41).  She

testified that she was unable to watch television, due to lack of concentration.  (Tr.  242).

***Medical Evidence***

In 2005, Gaines was treated by Dr. Amar Purohit ("Dr. Purohit"), an internal medicine

physician, for aphtous tongue ulcers, scattered rhonchi, a periodontal abscess, otitis and a low

back sprain.  (Tr. 157-163).  Dr. Purohit diagnosed Gaines with hypertension, a seizure disorder,

bronchial asthma and sarcoidosis.  (Tr. 156-63).

On August 19, 2005, Gaines was treated at Flushing Hospital's emergency room for a

ligamentous sprain of her right foot.  (Tr. 137-38).  Gaines's discharge instructions indicated that

she take ibuprofen, and that she should be able to return to work within three days and needed

work limitations, namely, prolonged standing and heavy lifting.  (Tr. 137-38).

On August 24, 2005, Gaines saw Dr. Steven Moalemi ("Dr. Moalemi"), of Empire

Physical Medicine and Pain Management, after which she commenced physical therapy to treat

her right foot injury.  (Tr. 102-13, 121-43).  At the initial visit to Dr. Moalemi, Gaines reported

her pain as five on a scale zero to ten.  (Tr. 141).  Dr. Moalemi recommended that Gaines obtain

an x-ray and diagnosed a foot contusion.  (Tr. 140).  On October 5, 2005, Gaines complained of

increased foot tenderness and Dr. Moalemi diagnosed right foot contusion.  (Tr. 133).  On

November 30, 2005, Gaines visited Dr. Moalemi, complaining of right foot pain, which

worsened with prolonged standing.  (Tr. 129).  Dr. Moalemi observed that Gaines's right foot

was tender and a mild decrease in her range of motion existed.  (Tr. 129).  He diagnosed Gaines

with foot contusion and referred her for a magnetic resonance imaging examination ("MRI") of

her right foot.  (Tr. 130).  On December 9, 2005, an MRI report about Gaines's right foot

revealed nothing remarkable.  (Tr. 127).  On December 12, 2005, Gaines visited Dr. Purohit who

diagnosed an impacted cerumen, hypertension, a seizure disorder and sarcoidosis, for which he

prescribed medication for her.  (Tr. 155).

Physical therapy notes for the period September 6, 2005, to June 29, 2007, indicate that

Gaines complained of pain and discomfort, but was able to tolerate and complete her physical

exercises.  (Tr. 96-101).  During this period, Dr. Moalemi examined Gaines intermittently, in

connection with authorizing physical therapy for her, and he continued to diagnose a foot

contusion.  (Tr. 102-135).  On April 7, 2006, Dr. Moalemi reported some diffuse tenderness at

Gaines's right foot and a mild decrease in her range of motion.  (Tr. 122).  He made similar

findings during subsequent examinations of Gaines, on August 11, September 14 and December

22, 2006.  (Tr. 109, 111, 113).  In December 2006, Dr. Moalemi referred Gaines to an orthopedic

clinic.  (Tr. 109).

On April 11, 2006, Dr. Purohit examined Gaines and diagnosed hypertension, a seizure

disorder, sarcoidosis, and bronchial asthma.  (Tr. 154).  He also completed a medical assessment

questionnaire, indicating that he saw Gaines at least every three months.  (Tr. 146).  Dr. Purohit

noted that Gaines had seizures and asthma "off and on."  (Tr. 146).  He reported Gaines's

medication as Dilantin, Advair, Singulair, Dyazide, Prednisone, Dilitazem and an Albuterol

inhaler.  (Tr. 147).  Dr. Purohit opined that Gaines was limited severely in her ability to deal

with work stress and that pain interfered frequently with her attention and concentration.  (Tr.

147).  He indicated that Gaines could: (a) walk only one city block without rest; (b) sit no more

4

than two hours in an eight-hour work day; (c) stand for no more than five minutes at a time; and (d) stand or walk for a total of less than two hours in an average work day.  (Tr. 147-48).  According to Dr. Purohit, Gaines needed to: (i) walk every thirty minutes; (ii) take unscheduled breaks every fifteen minutes; and (iii) shift at will from sitting, standing, or walking during the working day.  (Tr. 148).  He opined that Gaines could lift and carry less than ten pounds occasionally and had significant limitations in doing repetitive reaching, handling or fingering.  (Tr. 149).  He concluded that, due to Gaines's asthma and sarcoidosis, she should not be exposed to extreme temperatures, humidity, dust, gases and fumes.  (Tr. 150).

On July 6, 2006, Dr. Edmunde Stewart ("Dr. Stewart"), an orthopedic surgeon, performed an independent evaluation of Gaines, in connection with her worker's compensation claim.  (Tr. 74-78).  Dr. Stewart reviewed Gaines's medical records and the December 2005 MRI of her right foot.  (Tr. 76).  Gaines reported that she traveled to her evaluation by public transportation.  (Tr. 74).  Dr. Stewart noted that Gaines complained of discomfort in her right foot and was not taking medication.  (Tr. 75).  During the examination, Gaines would not stand on her right toes but would stand on her left toes.  (Tr. 76-77).  Gaines's gait was satisfactory and no sign of swelling of the mid-foot on palpitation was observed.  (Tr. 76-77).  Dr. Stewart reported that the neurocirculatory status of Gaines's toes was satisfactory, and she had full range of motion at her right ankle.  (Tr. 77).  He diagnosed status post-contusion of the right foot and subjective right foot pain.  (Tr. 77).  Dr. Stewart opined that Gaines was able to work as long as she: (i) did not lift, push, or pull over twenty pounds or climb or work at heights; (ii) limited her walking; and (iii) did not perform repetitive movements of her right foot.  (Tr. 77).

On November 2, 2006, Dr. Howard Finger, D.O. ("Dr. Finger"), a physician associated with DHS Diagnostic Medical Services, P.C., examined Gaines.  (Tr. 83-88).  Gaines traveled to

her examination by bus, accompanied by a cousin.  (Tr. 83).  Gaines stated that she had been diagnosed with sarcoidosis about four years earlier and she described frequent cough associated with shortness of breath after walking a couple of blocks or climbing a flight of stairs.  (Tr. 83). Gaines reported that she took Prednisone and Dilantin and complained of diffuse joint pain and seizures that resulted in a loss of consciousness.  (Tr. 83).  She explained that she had three to four seizures in 2006, and she had been depressed occasionally since the onset of sarcoidosis, but was not treated for depression.  (Tr. 83).  Gaines also complained of chronic pain, stiffness and swelling in her right foot.  (Tr. 83).

Dr. Finger observed no abnormalities of Gaines's skin or edema in her extremities, and her blood pressure was 150/90.  (Tr. 84).  Gaines's chest was symmetrical, her breath sounds were mildly to moderately decreased bilaterally, and some mild bilateral expiration wheezes were heard.  (Tr. 84).  Dr. Finger observed that Gaines's gait was slow, and she walked with a mild limp, but was able to walk without using a cane.  (Tr. 84).  Dr. Finger noted that Gaines had no difficulty standing, but could not push off her foot due to complaints of pain, and her right foot exhibited mild diffuse swelling.  (Tr. 84).  Gaines's muscle strength was 4+ out of 5 for her lower extremities.  (Tr. 84).  Straight leg raising was negative, and her lumbosacral and cervical spines had a normal range of motion.  (Tr. 84).  Dr. Finger noted no gross deformity in Gaines's right foot.  (Tr. 84).  He observed that Gaines could dress herself slowly and was able to grasp and manipulate small objects.  (Tr. 84).  No neurological abnormalities were observed.  (Tr. 84). Gaines underwent a pulmonary function test, which Dr. Finger reported revealed mild pulmonary restrictions.  (Tr. 85, 87).  Dr. Finger's diagnostic impressions were: (1) a history of sarcoidosis, with likely pulmonary involvement; (2) chronic pain syndrome involving her right foot; (3) a history of seizure disorder; and (4) a history of depression.  (Tr. 85). Regarding work-

6

related activities, Dr. Finger noted that Gaines had no great difficulties sitting, but was moderately limited in her ability to lift, carry, push, pull, climb stairs and engage in physically demanding work.  (Tr. 85).  Dr. Finger opined that Gaines should avoid climbing, balancing, or other such activities which might place her or others at risk of injury.  (Tr. 85).

On December 6, 2006, a physical residual functional capacity assessment was done by "Smith, M."[2] ("Smith"), a disability examiner.  (Tr. 89-94).  Smith indicated that Gaines's primary diagnosis was sarcoidosis and her secondary diagnosis was seizure disorder.  (Tr. 89).  Smith noted that Gaines's exertional limitations included: (a) occasionally lift and carry maximum ten pounds; (b) frequently lift and carry less than ten pounds; (c) stand or walk with normal breaks for a total of at least two hours in an eight-hour workday; (d) sit with normal breaks for a total of about six hours in an eight-hour workday, and (e) push and pull as limited by lift and carry abilities.  (Tr. 90).  Smith explained that his exertional assessment was based on Gaines's sarcoidosis symptoms, including cough and shortness of breath while walking a couple of blocks or climbing a flight of stairs.  (Tr. 90).  He also noted that Gaines was taking Prednisone daily, had diffuse joint pain and stiffness and hypertension.  (Tr. 90).  Smith also considered Gaines's seizure disorder, manifested by Gaines's loss of consciousness without prior warning and that she had three to four seizures in 2006, although she told "the attorney rep" that she had ten to eleven in 2006.  (Tr. 90).  Smith reported that Gaines took Dilantin and had blurry vision and shaking of the head prior to the seizure.  (Tr. 90).  According to Smith, Gaines had depression since the onset of sarcoidosis, although she received no treatment for it.  (Tr. 91).  Smith also noted that Gaines had a mild limp due to foot pain and mild chest restrictions.  (Tr.

---

[2] It would appear from the record that Smith, M. is "the reviewing analyst from the state agency," to whom the ALJ referred in his decision.  (Tr. 20).

91).  He noted that environmental limitations were unlimited and Gaines should avoid concentrated exposure to hazards.  (Tr. 92).

On February 26, 2007, Dr. Moalemi examined Gaines who complained of foot pain and tenderness.  (Tr. 107).  He noted that she had not visited an orthopedic surgeon, as recommended previously.  (Tr. 107).  Gaines's range of motion was within normal limits.  (Tr. 107).  Dr. Moalemi diagnosed a right foot contusion.  (Tr. 107).  On April 5, 2007, Dr. Moalemi saw Gaines and she complained that she had problems walking a distance of about eight to ten blocks.  (Tr. 105).  Dr. Moalemi repeated his findings and diagnosis from February 26, 2007.  (Tr. 105).  On June 29, 2007, Dr. Moalemi examined Gaines, noting that she failed to visit an orthopedic surgeon despite his recommendation.  (Tr. 103).  His findings and diagnosis were the same as those on April 5, 2007.  (Tr. 103).

On April 1, 2007, Dr. Purohit wrote a note indicating that Gaines's limitations, noted in the April 11, 2006 questionnaire, remained in effect.  (Tr. 220).  Dr. Purohit also noted that he had not examined Gaines, since April 11, 2006.  (Tr. 220).  In April 2007, Dr. Purohit examined Gaines and diagnosed tinea corporis, hypertension, seizure disorder, sarcoidosis and bronchial asthma, and he prescribed Prednisone, Atenolol and Dilantin.  (Tr. 184).  On September 13, 2007, Dr. Purohit indicated that Gaines's blood pressure was 160/100 and his notes reflected the same diagnosis as in April 2007.  (Tr. 183).

On November 7, 2007, Dr. Stewart examined Gaines in connection with her worker's compensation claim.  (Tr. 79-82).  Gaines stated that she traveled to the examination by public transportation and she complained of right foot ache and throbbing.  (Tr. 79-80).  Gaines reported that she had a history of: (a) sarcoidosis, for which she took Prednisone; (b) seizures, triggered by sarcoidosis; and (c) hypertension.  (Tr. 80).  Dr. Stewart observed that Gaines had a

8

moderate limp in the right leg, which was eased by the use of a cane.  (Tr. 81).  He noted mild

swelling to the right mid-foot, with moderate tenderness on palpation.  (Tr. 81).  Dr. Stewart also

observed that Gaines had full range of motion at her right ankle and she was incapable of

climbing one step with her right foot and performing a heel rise on the right side.  (Tr. 81).  Dr.

Stewart opined that Gaines had a "moderate partial temporary disability relative to her right

foot" and was able to work with "restrictions of no lifting, pushing or pulling over 10 pounds."

(Tr. 81).  He also noted that Gaines could not climb or work at heights, her walking was limited,

and she could not perform repetitive or strenuous activities involving the right lower extremity.

(Tr. 81-82).

In an undated letter, submitted to the ALJ on December 28, 2007, Dr. Purohit wrote, in

pertinent part:

> [Gaines] suffers with pulmonary sarcoidosis, bronchial asthma and gets frequent
> attacks of bronchspasm and shortness of breath despite all treatment she is receiving.
> She also has skin lesions of sarcoidosis despite Prednisone therapy.  She suffers with
> Seizure Disorder and is on Dilantin therapy and despite Dilantin therapy she often
> gets Seizure attacks and ends in emergency rooms.  She has hypertensive A.S.H.D.
> and is on Tenoretic 50/25 1 P.O.Q.D. and Cardizem ER 180 mg tab 1 P.O.Q.D.  She
> also suffers with lower back pain, which gets aggravated by mild to moderate
> exertion and requires Antispasmadics (cyclobenzaprine) and Hydrocodone with
> APAP (5/500mg tab) several times a day. . . .  If you need more information about
> her health, please get in touch with me.  (Tr. 219).

### The ALJ's Decision

On March 10, 2008, the ALJ rendered his decision.  (Tr. 13-21).  The ALJ stated that the

issues considered were whether Gaines: (a) was disabled, pursuant to 42 U.S.C. §§ 416 and 423;

and (b) met the insured status requirement, pursuant to 42 U.S.C. §§ 416 and 423.  (Tr. 13).  The

ALJ determined that Gaines: (1) met the insured status requirements of SSA, through December

31, 2010; (2) had not engaged in substantial gainful activity, since August 19, 2005; (3) has the

following severe impairments: pulmonary sarcoidosis, seizure disorder, bronchial asthma, right foot impairment and hypertension; (4) does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) has the residual functional capacity to perform sedentary work; (6) is unable to perform any past relevant work; (7) can perform jobs existing in significant numbers in the national economy; and (8) was not disabled, from August 19, 2005, through the date of the ALJ's decision.  (Tr. 15-21).  More specifically, the ALJ determined that Gaines had the physical capacity to sit for up to six hours and stand or walk for up to two hours in an eight-hour workday.  (Tr. 16).  She could lift and carry a maximum of ten pounds and push and pull to her lifting capacity in a work environment free from environmental irritants and concentrated exposure to dust, fumes, gases and temperature extremes.  (Tr. 16).  The ALJ found that Gaines had additional non-exertional limitations secondary to seizure disorder, precluding her from performing jobs involving exposure to dangerous working conditions or activities that would place her at risk of injury, such as unprotected heights, open machinery, climbing or operating a motor vehicle.  (Tr. 16).  The ALJ stated that Gaines's allegations of a disabling foot injury are not substantiated by evidence from her primary treating physician.  (Tr. 17).

Although the ALJ found that Gaines's medically determinable impairments could be expected, reasonably, to produce the alleged symptoms, he found that her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible.  (Tr. 19).  The ALJ noted that Gaines's history of sarcoidosis, seizure disorder, asthma and hypertension, which predate her foot injury, did not prevent her from working with these conditions prior to her foot injury, and the evidence does not show any significant and ongoing deterioration of her conditions.  (Tr. 19).  According to the ALJ, two independent examiners

10

found that Gaines's foot injury was only moderately limiting with respect to prolonged walking and heavy lifting and the reports from her own doctor do not mention a disability of the right foot.  (Tr. 19).  The ALJ found that Gaines's inconsistent statements, such as, for example, about the number of seizures she experienced, and that she was not taking medication when she complained of chronic and severe pain, reflected negatively on the credibility of her subjective complaints.  (Tr. 19).  Similarly, Gaines's receipt of unemployment compensation in 2006, which required her to assert that she was ready, willing and able to work, was inconsistent with her assertion of disability.  (Tr. 19).

In considering Gaines's treating physician's opinion, the ALJ noted that Dr. Purohit's clinical records do not support the extreme limitations in his April 11, 2006 report.  (Tr. 19).  The ALJ determined that the only factual basis for Dr. Purohit's April 11, 2006 report was his diagnosis of sarcoidosis, hypertension, seizure disorder and bronchial asthma, and that seizures, asthma attacks and headaches occurred "off and on," and no indication existed that Gaines had side effects from her medications that may have implications for working.  (Tr. 19-20).  Since Dr. Purohit's April 11, 2006 report was unsupported by contemporaneous treating notes or by any objective diagnostic studies, the ALJ gave it "weight only to the extent that it is consistent with this residual functional capacity assessment."  (Tr. 19-20).  The ALJ observed that Dr. Purohit's note, dated April 1, 2007, had no factual basis because Dr. Purohit had not seen Gaines since April 2006.  (Tr. 20).  The ALJ also noted that Dr. Purohit's undated report, submitted on December 28, 2007, was unsupported by clinical findings or diagnostic studies and nothing in the record documented the incidents of frequent seizures and emergency room treatments.  (Tr. 20).  The ALJ found that, to the extent the undated report was inconsistent with the clinical records, the contemporaneous clinical records would be given greater weight.  (Tr. 20).  The ALJ

11

also observed that Dr. Purohit only saw Gaines infrequently since the alleged disability onset date: twice in 2005, once in 2006 and twice in 2007.  (Tr. 20).

The ALJ gave substantial weight to Dr. Stewart's opinion, with respect to limitations associated with Gaines's right foot, because his conclusions were based on accepted diagnostic techniques and clinical practices and he was well qualified to render an opinion.  (Tr. 20).  For the same reasons, the ALJ also gave substantial weight to the opinion of "the consultative doctor," Dr. Finger, while the "opinion of the reviewing analyst from the state agency" was given less weight because he did not account for Gaines's environmental limitations, did not examine her and is not a physician.  (Tr. 20).  The ALJ determined that, considering Gaines's age, education, work experience, and "[b]ased on a residual functional capacity for the full range of sedentary work," Gaines was not disabled and her non-exertional limitations did not diminish significantly the exertionally possible range of work.  (Tr. 21).  The ALJ concluded that Gaines was not disabled from August 19, 2005, to the date of his decision.  (Tr. 21).

### Gaines's Motion for Judgment on the Pleadings

Gaines contends "that the ALJ['s] decision was not supported by substantial evidence and the ALJ failed to properly weigh the medical evidence indicating that the plaintiff could only do less then sedentary work."  Alternatively, Gaines argues "that the ALJ failed to properly take all steps required to fully develop the evidence to resolve discrepancies in the medical evidence and the plaintiff's testimony and to consider testimony of vocational and medical experts."  According to Gaines, the ALJ rejected improperly the credibility of her complaints of pain in his assessment of her restrictions because he stated that her complaints were inconsistent with remaining portions of the record, without considering fully her testimony about her activities, the nature, location, onset and duration of [Gaines's] pain, the type of medication taken and the

12

other types of treatment received.  Gaines contends that her "subjective complaints are consistent with both the longitudinal clinical record and the findings and opinions of the doctors," and the "ALJ failed to contact the doctors for clarification" of her hospitalization and emergency room visits.  Moreover, the ALJ made no finding that Gaines was able to perform the full range of sedentary work, and the testimony of the vocational expert was required to determine the extent to which Gaines's occupational base was eroded by the enumerated non-exertional restrictions.

Gaines maintains that the ALJ did not provide a basis for rejecting the additional non-exertional limitations set forth in Dr. Purohit's residual functional capacity assessment, which indicated that Gaines's attention and concentration are frequently affected by her symptoms and that she had severe limitations in dealing with work stress.  The ALJ's failure to analyze Gaines's ability to deal with stress and the impairments involving concentration and attention required that the ALJ provide a function by function analysis of Gaines's residual functional capacity, which the ALJ failed to do.  Gaines contends that Dr. Purohit's residual functional capacity assessment is supported by the clinical and diagnostic record and no substantial evidence supports the ALJ's rejection of that opinion.  Furthermore, the ALJ should have contacted Gaines's treating physician to obtain clarification of the history of her seizures that have led to emergency room visits and he should have requested hospital records.

Gaines contends that the ALJ accorded improper weight to Dr. Stewart's report because that physician was not a treating source or an "independent" medical examiner, but a non-treating examiner hired by Gaines's worker's compensation insurance carrier, with a pecuniary interest in not finding Gaines disabled.  Thus, the ALJ failed to advise how this factor impacted the weight of the evidence, as required by the Social Security Act regulations.  According to Gaines, since the ALJ accorded improper weight to various medical opinions in the record and

13

failed to provide a function by function analysis of her ability to engage in work activities, he did not meet his burden at the last step of the disability analysis. Gaines seeks reversal of the ALJ's decision and remand for the calculation of benefits.

**_Commissioner's Motion for Judgment on the Pleadings_**

The Commissioner contends that the ALJ determined properly that Gaines's claims regarding subjective symptoms were not credible and he provided numerous reasons for his determination. According to the Commissioner, the record does not corroborate Gaines's claim of frequent or disabling seizures. Although Gaines complained of severe joint and low back pain, her examination findings failed to support those subjective complaints and no record indicated that her foot condition was severe; rather, she completed her therapy exercises well and over time decreased the frequency of her therapy. Similarly, the Commissioner contends, the record does not support Gaines's claims that her sarcoidosis resulted in numerous disabling symptoms and pulmonary distress or that she has been hospitalized for that condition. The ALJ included properly Gaines's seizure and pulmonary conditions in his residual functional capacity analysis. The Commissioner contends that Dr. Stewart's notation that, as of July 2006, Gaines was not taking any medications, is plausible in light of the fact that Gaines visited her primary physician only once in 2006.

According to the Commissioner, the ALJ determined properly that Gaines could perform work and Gaines misunderstands the ALJ's burden at the last step of the disability analysis, which is to show that work exists in the national economy that she can do, not to provide evidence of her residual functional capacity. The ALJ determined that Gaines can do sedentary work and had nonexertional limitations which did not erode significantly Gaines's job base for sedentary work and did not preclude the ALJ's application of the medical vocational guidelines.

14

Since unskilled sedentary work involves indoor environments, which typically do not require exposure to pulmonary irritants or involve climbing, working at heights or near machinery, the ALJ was not compelled to obtain vocational expert testimony to sustain the burden of proving that work existed that Gaines could perform.

The Commissioner contends that the ALJ determined properly that Dr. Purohit's opinions were not entitled to controlling weight because his diagnosis and treatment of Gaines was the same before and after the alleged onset of disability.  It was proper for the ALJ to note that Dr. Purohit's clinical notes do not support a finding that Gaines's condition changed materially after the alleged onset of disability and they do not corroborate the extreme limitations he offered in his functional capacity assessment.  According to the Commissioner, Dr. Purohit's notes indicate that the only change in Gaines's condition, proximate to the alleged onset of disability, was the foot bruise she suffered while at work.  As the negative MRI and Dr. Moalemi's records show, this mild condition could not account reasonably for the limitations noted by Dr. Purohit.  Moreover, the ALJ found properly that infrequent treatment of Gaines by Dr. Purohit was not indicative of disabling conditions or adequate to support his highly restrictive assessment.  The Commissioner argues the ALJ also determined properly that Dr. Purohit's functional assessments were not supported by his own clinical records or were contradicted by the more detailed findings of Dr. Stewart and Dr. Finger.  For example, although Dr. Purohit opined that Gaines would have significant problems performing tasks with her hands, he failed to offer any clinical findings or condition to account for this claim.  On the contrary, Dr. Finger examined Gaines and reported that she had normal grip strength in both hands.  Her joints and range of motion were normal and she was able to grasp and manipulate small objects.  The Commissioner contends that Gaines's claim that her concentration and ability

15

to deal with stress were diminished was undermined by the paucity, in Dr. Purohit's contemporaneous treatment notes, of any suggestion that her mental functioning was affected by her conditions, and no other physician reported anything that would suggest an inability to concentrate or deal with stress.  According to the Commissioner, the ALJ had no affirmative duty to develop the record here given the comprehensive medical documentation in the record.

## DISCUSSION

### *Legal Standard*

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

> A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).  "Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations."  Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (internal citations omitted).  "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled, or to answer in the first instance the inquiries posed by the five-step analysis set out in the SSA regulations."  Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (internal citation omitted).

To qualify for disability benefits, an individual must be unable "to engage in any

16

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA

regulations establish a five-step process for determining a disability claim. See 20 C.F.R. §

404.1520(a)(4).

> If at any step a finding of disability or nondisability can be made, the [Social Security Administration] will not review the claim further. At the first step, the agency will find nondisability unless, the claimant shows that he is not working at a "substantial gainful activity." At step two, the [Social Security Administration] will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the [Social Security Administration] assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the [Social Security Administration] to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

 Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003) ( internal citations

omitted). "[T]he ALJ generally has an affirmative obligation to develop the administrative

record." Melville, 198 F.3d at 51.

If the ALJ finds that the claimant's "impairment(s) does not meet or equal a listed

impairment, [the ALJ] will assess and make a finding about [the claimant's] residual functional

capacity based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e).

"Although the claimant bears the general burden of proving that he is disabled under the statute,

'if the claimant shows that his impairment renders him unable to perform his past work, the

burden then shifts to the [Commissioner] to show there is other gainful work in the national

17

economy which the claimant could perform.'" <u>Draegert v. Barnhart</u>, 311 F.3d 468, 472 (2d Cir. 2002) (quoting <u>Carroll v. Sec'y of Health & Human Servs.</u>, 705 F.2d 638, 642 (2d Cir. 1983)). "[T]he Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity." <u>Poupore v. Astrue</u>, 566 F.3d 303, 306 (2d Cir. 2009); <u>see</u> 20 C.F.R. § 404.1560(c)(2). "If the issue in determining whether [the claimant is] disabled is whether [the claimant's] work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue, [the Commissioner] may use the services of a vocational expert or other specialist. [The Commissioner] will decide whether to use a vocational expert or other specialist." 20 C.F.R. § 404.1566(e).

When "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [it will be given] controlling weight." 20 C.F.R. § 404.1527(d)(2). Unless the ALJ gives a treating physician's opinion controlling weight, the ALJ must consider the following factors in deciding what weight to accord to any medical opinion: (1) the existence of an examining relationship; (2) the existence of the treatment relationship, namely the length of the treatment relationship and the frequency of examination; (3) supportability, namely, more weight is given the more relevant the evidence and the better the explanation presented are in supporting an opinion; (4) consistency of the opinion with the record; (5) specialization; and (6) other relevant factors. <u>See</u> C.F.R. § 404.1527(d). The ALJ must give "good reasons" for the weight given to the treating source's opinion. <u>See</u> 20 C.F.R. § 404.1527(d)(2).

When the medical findings indicate that the claimant has a medically determinable

impairment(s) that could reasonably be expected to produce symptoms such as pain, the ALJ

must evaluate the intensity and persistence of the claimant's symptoms to determine how those

symptoms limit the claimant's capacity to work.  See 20 C.F.R. § 404.1529(c)(1).  The ALJ must

always attempt to obtain objective medical evidence in determining the intensity and persistence

of the claimant's symptoms.  See 20 C.F.R. § 404.1529(c)(2).  Since symptoms may suggest a

greater severity of impairment than can be shown by objective medical evidence alone, the ALJ

must consider other evidence about the symptoms, including the following factors relevant to the

symptoms: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity

of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the

symptoms; (4) the type, dosage, effectiveness and side effects of any medication the claimant

takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the

claimant receives or has received for relief of pain or other symptoms; (6) any measures other

than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other

factor concerning the claimant's functional limitations and restrictions due to pain or other

symptoms.  See 20 C.F.R. § 404.1529(c)(3).  The statements about the intensity and persistence

of pain or other symptoms may not be disregarded solely because they are not substantiated by

objective medical evidence.  See 20 C.F.R. §404.1529(c)(2).  One factor that may impact the

claimant's credibility is a showing that the claimant is not following the treatment as prescribed

and no good reason exists for that failure.  See Social Security Ruling ("SSR") 96-7p.

> However, the [ALJ] must not draw any inferences about an individual's symptoms
> and their functional effects from a failure to seek or pursue regular medical treatment
> without first considering any explanations that the individual may provide, or other
> information in the case record, that may explain infrequent or irregular medical visits
> or failure to seek medical treatment.  The [ALJ] may need to recontact the individual
> or question the individual at the administrative proceeding in order to determine
> whether there are good reasons the individual does not seek medical treatment or

does not pursue treatment in a consistent manner.  The explanation provided by the individual may provide insight into the individual's credibility.

Id.

The ALJ's determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight."  Id.

***Application of Legal Standard***

The ALJ's Credibility Finding

The ALJ found Gaines's testimony about the intensity, persistence and limiting effects of her symptoms "not entirely credible" because: (a) she demonstrated an ability to work with sarcoidosis, seizure disorder, asthma and hypertension, prior to her foot injury, and "[t]he evidence does not show a significant and ongoing deterioration"; (b) no evidence in the record exists of frequent seizures or prolonged symptoms from sarcoidosis; (c) the record does not contain evidence of hospitalization for sarcoidosis or hospitalization or emergency room treatment for asthma exacerbation; (d) her headaches are relieved by over-the-counter medication; (e) she gave inconsistent statements about the number of seizures she had and the warning signs of an oncoming seizure; (f) she reported not taking medication in 2006; and (g) her 2006 statement, in connection with unemployment compensation, that she was ready, willing and able to work, is inconsistent with her claim of disability.  That Gaines demonstrated an ability to work prior to her foot injury, despite suffering from sarcoidosis, seizure disorder, asthma and hypertension, is not a proper basis for rejecting her symptoms allegations because she testified that her symptoms affected her while she was working and worsened right before

she had the foot injury.  The record demonstrates that, in July 2004, Gaines had seizures and was admitted to North General Hospital, and, in April 2005, she passed out at work and had to be sent home.  Gaines testified that she had headaches "two or three times a week" and had to lie down and take over-the-counter medication, which prevented her from going to work.  She stated that, prior to her foot injury, she was able to work only two days a week, due to her headaches and inability to "get up and walk."  Working only two days a week, due to her health condition, demonstrates that, although Gaines still worked while suffering from headaches prior to her foot injury, her condition worsened to such an extent that she spent more time not working than working.

Gaines's testimony, that her sarcoidosis is affecting the right side of her head and her concentration, was cut short by the ALJ.  When Gaines stated: "The sarcoidosis is affecting my whole side of my head.  It's in my brain, on this side of my head, the right side of my head, the sacroidosis," the ALJ changed the topic: "And how long were you a traffic agent?"  The ALJ's interdiction of Gaines's testimony about her sarcoidosis symptoms is especially troubling given that Dr. Purohits' clinical notes are mostly devoid of a description of the symptoms Gaines had from the conditions with which she was diagnosed and for which she was treated by him, from 2004 to 2006 and in 2007.  The ALJ's affirmative duty to develop the record required, at minimum, that he elicit statements from Gaines about the intensity, persistence and limiting effects of her symptoms, not that he cut short her testimony about her symptoms.

This was not the only time the ALJ cut short Gaines's testimony.  The ALJ rejected Gaines's testimony about the number of seizures as incredible because: (a) she told Dr. Finger that she experienced three to four seizures in 2006; (b) her attorney conveyed to the state agency that she reportedly had ten to eleven seizures in 2006; and (c) she testified at the hearing that she

had many seizures in 2007, but could remember only two or three.  However, the ALJ never

asked Gaines how many seizures she had in 2006 or 2007.  He asked: "When's the last time you

had a seizure?" and Gaines explained that two weeks prior to the hearing, she had a seizure at

her mother's home and she lost consciousness.  The ALJ then asked:

> Q.   And when was, when did you have a seizure before that?
> A.   I had a seizure in the, in the, while I was standing, waiting for my sister to come, in the street.
> Q.   When was that?
> A.    May? I think it was May.
> Q.   So basically you're saying you have a seizure disorder?
> A.   Yes, sir.
> Q.   Well, so you've had two seizures; May and - -
> A.   I had - -
> Q.   - - November, is that right?
> A.   Okay. Yes. I had it in my house, too.  I had, in my house, too, I had one when I was, you know, sitting and then I just had the, I had the seizure and then I woke up, but I didn't know it happened until I woke up.  You know, everything was all over, over the floor.
> Q.   So you've been to a doctor and what does he say?
> A.   Well, he's, see, because he's treating me with the medication, Dr. [Purohit]. That's the only doctor I go to, Dr. [Purohit] but with, even with the medication, you know, I still get the seizures.
> Q.   Now, did the driver run over your foot intentionally or by accident?

Not only did the ALJ interrupt Gaines's testimony about her seizures in 2007, but he never

elicited any statements from her about the frequency, duration and pattern of her seizures.

Moreover, the inconsistency between Gaines's attorney's statement, that Gaines had ten to

eleven seizures in 2006, and Gaines's statement to Dr. Finger, that she had three to four seizures

in 2006, could have been clarified by Gaines at the hearing.  As Gaines's testimony about her

seizures was cut short by the ALJ and no testimony was actually elicited from Gaines about the

frequency of her seizures, rejecting her testimony about the number of seizures she experienced

as incredible was erroneous.

　　　　Similarly, the ALJ cut short Gaines's testimony about the medication she was taking:

22

| | |
|---|---|
| Q. | Are you taking any medication now? |
| A. | Yes, sir. |
| Q. | What do you take? |
| A. | I don't know, but I have them with me.  I don't know exactly - - |
| [Attorney]: | It's called Phenytoin. |
| [Gaines]: | I take Prednisone and I can't, I don't, I can't think of them the seizure medicine. |
| [Attorney]: | It's Phenytoin, P-H-E-N-Y-T-O-I-N, I believe. |
| [Gaines]: | And, I'm taking - - |
| [The ALJ]: | So you've been out of work since August 19th, 2005? |
| A. | Yes, sir. |

The ALJ failed to inquire of Gaines regarding the factors required to be considered in evaluating Gaines's symptoms, such as her daily activities, location, duration, frequency and intensity of her symptoms, precipitating and aggravating factors, the type, dosage, effectiveness and side effects of any medication taken, other treatment and measures used to relieve the pain and other symptoms or any other factors concerning functional limitations due to pain and other symptoms.  He did not ask Gaines to explain why she was not taking medication in 2006. The ALJ also did not seek testimony from Gaines's family and friends concerning Gaines's: (a) seizure patterns, given Gaines's loss of consciousness during her seizures; or (b) daily activities.  In sum, the scant record concerning Gaines's pain and other symptoms and her very limited testimony at the hearing — which was often cut short by the ALJ — do not provide sufficient bases upon which to find Gaines incredible.  The ALJ failed in discharging his duty to develop the record, by inquiring concerning the factors required to be considered in evaluating pain and other symptoms.  Gaines's statements about her symptoms cannot be rejected solely because the available objective medical evidence does not substantiate them.  See 20 C.F.R. § 404.1529(c)(2).  Therefore, the ALJ's credibility finding was erroneous.

<u>Whether the ALJ Erred at Step Five of the Sequential Analysis</u>

After the ALJ determined, at step three of the sequential analysis, that Gaines does not have an impairment that meets or equals one of the listed impairments, he made the following determination: "After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a)."  However, at step four of the sequential analysis, the ALJ must consider the "assessment of [the claimant's] residual functional capacity and [the claimant's] past relevant work."  20 C.F.R. § 404.1520(a)(4)(iv).  The ALJ's finding that Gaines "has residual functional capacity to perform sedentary work" was made before the ALJ's step four finding that Gaines "is unable to perform any past relevant work."  The ALJ erred in making the finding about Gaines's residual functional capacity to perform other work before completing step four, because the ALJ must follow the five-step-sequential analysis in determining disability.  See 20 C.F.R. § 404.1520.  Only after the step four finding, that Gaines does not have residual functional capacity to perform her past relevant work, could the ALJ use the step four residual functional capacity assessment and Gaines's vocational factors to determine whether she "can make an adjustment to any other work that exists in the national economy."  20 C.F.R. § 404.1545(a)(5)(ii); see 20 C.F.R. § 404.1560(c).

Moreover, the ALJ erred when he stated that,"[b]ased on a residual functional capacity for the full range of sedentary work, considering the claimant's age, education, and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 201.28," because his finding was that Gaines "has the residual functional capacity to perform sedentary work," not that she has "a residual functional capacity for the full range of sedentary work."  Although the ALJ also found that Gaines's "non-exertional limitations do not significantly diminish the

24

exertionally possible range of work," that finding, necessary for the conclusion that Gaines has

residual functional capacity for the full range of sedentary work, was made subsequent to the

conclusion for which it was indispensable.  The ALJ erred in not following the sequence

imposed by the five step sequential analysis.

Treating Physician's Opinion

The ALJ rejected, properly, Dr. Purohit's April 1, 2007 note, styled "Update of Medical

Assessment Questionnaire from Amar L. Purohit MD," in which Dr. Purohit stated that Gaines's

condition remains the same as it was on April 11, 2006, because the note also stated that Dr.

Purohit last examined Gaines on April 11, 2006.  Thus, absent any examination of Gaines by Dr.

Purohit between April 11, 2006 and April 1, 2007, Dr. Purohit's note was useless.

The ALJ also rejected Dr. Purohit's undated report, submitted after the hearing, because

it was unsupported by clinical findings or diagnostic studies and the record did not indicate

Gaines's "frequent seizures and emergency room treatment."  However, most of Dr. Purohit's

undated, post-hearing letter was supported by clinical findings.  "Clinical" means "pertaining to

. . . or founded on actual observation and treatment of patients."  Richard Sloane, The Sloane-

Dorland Annotated Medical-Legal Dictionary149 (1987).  The record demonstrates that Dr.

Purohit examined Gaines, diagnosed and treated her for sarcoidosis, bronchial asthma and

seizure disorder from 2004 through 2007.  Dr. Purohit's clinical notes indicate that Gaines was

treated with Tenoretic, Dilantin and Prednisone.  Dr. Purohit's clinical notes do not demonstrate

that Gaines: (a) "often gets Seizure attacks and ends in emergency rooms"; (b) has "hypertensive

A.S.H.D." and is "on Cardizem"; and (c) "[s]uffers with lower back pain," requiring medication

daily.  However, the "ALJ cannot reject a treating physician's diagnosis without first attempting

to fill any clear gaps in the administrative record."  Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir.

1999).  Although Dr. Purohit made himself available for more information, the ALJ failed to fill

the gaps in the record by seeking additional documents supporting Dr. Purohit's findings, such

as emergency room records and his clinical notes after September 13, 2007.  Having failed to

seek additional information supporting Dr. Purohit's findings concerning Gaines's seizure

attacks, hypertensive arteriosclerotic heart disease and lower back pain, the ALJ rejected Dr.

Purohit's undated opinion based on the scant information provided in it.  The ALJ's conclusion,

based on the incomplete record, is not consonant with his affirmative duty to develop the record.

      The ALJ also rejected Dr. Purohit's April 11, 2006 opinion because " it is unsupported

by the contemporaneous treating notes or by any objective diagnostic studies" and gave it

"weight only to the extent that it is consistent with this residual functional capacity assessment.

(Ex. 4F)."  The ALJ did not identify "this residual functional capacity assessment" he used to

determine the weight given to Dr. Purohit's April 11, 2006 opinion.  Exhibit 4F consists of: (1)

medical records from Dr. Moalemi, including physical therapy progress notes; and (2) Dr.

Purohit's April 11, 2006 opinion.  Dr. Moalemi's records concern his treatment of Gaines for her

foot injury and contain no residual functional capacity assessment.  The ALJ stated he gave

weight to Dr. Purohit's April 11, 2006 opinion only to the extent it was consistent with an

unidentified residual functional capacity assessment.  It is impossible for the Court to review the

weight given to Dr. Purohit's April 11, 2006 opinion because the ALJ did not, as he was required

to do, "give good reasons . . . for the weight [given] to treating source's opinion."  20 C.F.R. §

404.1527(d)(2).  The ALJ's failure to provide an adequate explanation for rejecting Dr. Purohit's

opinion was an error.

### *Remand*

      "When there are gaps in the administrative record or the ALJ has applied an improper

legal standard," remand to the Commissioner for further development of the evidence and application of the proper standard is warranted.  Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).  Here, remand to the Commissioner so the ALJ can develop the record and apply the correct legal standard, as explained above, is appropriate.

## RECOMMENDATION

For the foregoing reasons, I recommend that: (1) the plaintiff's motion for judgment on the pleadings, Docket Entry No. 10, be denied; (2) the defendant's motion for judgment on the pleadings, Docket Entry No. 14, be denied; and (3) the case be remanded to the Commissioner for further development of the record and for reconsideration of Gaines's disability under the correct legal standard.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Jed S. Rakoff, 500 Pearl Street, Room 1340, New York, New York, 10007, and to the chambers of the undersigned, 40 Centre Street, Room 540, New York, New York, 10007.  Any requests for an extension of time for filing objections must be directed to Judge Rakoff.  FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF

OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  See Thomas v. Arn, 474

 U.S. 140, 106 S. Ct. 466 (1985); Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003).

Dated: New York, New York                        Respectfully submitted,
      July 21, 2011

                                              Kevin Nathaniel Fox
Copies mailed to:                                KEVIN NATHANIEL FOX
                                                 UNITED STATES MAGISTRATE JUDGE
Paul Tufo, Esq.
John E. Gura, Jr., Esq.

28